WRIGHT, Justice.
The complainants/appellants, Dora S. Young and Mary McCormick, were the duly reelected and serving principal chief and tribal secretary, respectively, of the Sac and Fox Nation. On October 4, 1996, a petition requesting a Governing Council meeting on October 19, 1996, and containing a lengthy list of grievances against Sac and Fox Nation personnel director Merlin McClellan, history and cultural director Judy Walkingstick, principal chief Dora Young, and tribal secretary Mary McCormick was filed -with the tribal Business Committee. One of the signatories to the petition was the respondent/appellee, Oma Patrick, who was at that time a private citizen of the Sac and Fox Nation, and who had not yet been appointed to the tribal Grievance Committee. On October 9, the Business Committee validated the petition and set a special Governing Council meeting for November 2. At the same meeting, the Business Committee appointed Oma Patrick to fill the vacancy on the Grievance Committee existing due to the death of Edward O’Brien.
A second petition was circulated corn-plaining that the Business Committee set the requested governing council meeting on November 2, instead of the requested date of October 19, requesting the seating of a third Grievance Committee member, and referencing the allegations of the first petition. This petition was filed with the Business Committee on October 23, and Patrick did not sign the second petition. On October 28, Oma Patrick was sworn in asa member of the Grievance Committee. The special Governing Council meeting was held on November 2, with Dora S. Young as principal chief presiding. No action was taken by the Governing Council, and the meeting was adjourned.
A third petition was presented to the Grievance Committee on November 15, 1996, requesting another Governing Council meeting on December 7 “to aet upon the two (2) petitions presented in October 1996 to the principal chief and the Grievance Committee chairman” and to act upon alleged misfeasance by the principal chief. Patrick did not sign the third petition. The Grievance Committee chose to conduct a hearing on the third petition.
Complainant/appellant Dora S. Young filed an action in the District Court of the Sac and Fox Nation in Case Number CIV-97-01 seeking an injunction prohibiting Oma Patrick from participating in the Grievance Committee hearing on grounds that the fact she had signed the initial petition created a conflict of interest in her participation in the Grievance Committee hearing. After hearing, the District Court ordered Young to first present her claim for recusal of Oma Patrick to the Grievance Committee before requesting further relief from the court. The Grievance Committee met and considered Young’s request, and voted to allow Patrick to continue to participate on the Grievance Committee, and denied Young’s request.
The full Grievance Committee, including Patrick, then conducted a hearing at which various persons, including Dora Young, Mary McCormick, and other members of the Business Committee, were given the opportunity to make presentations to the Grievance Committee. On January 22, 1997, Grievance Committee member Walter Coker submitted his resignation, and that resignation was accepted by the Business Committee on February 6.
The Grievance Committee, then consisting of respondents/appellees Springer and Patrick, made a finding that probable *542 cause did exist for removal from office as to both Young and McCormick, and called a meeting of the Governing Council for February 8, 1997. That meeting was postponed for various reasons, but was finally held on February 22, with Louis Springer presiding, and Oma Patrick actively assisting the chairman. Because of a death in the tribe, that meeting was recessed until March 1. The Governing Council voted at that time to remove both Young and McCormick from their offices by the constitutionally required two-thirds majority. However, at both meetings of the Governing Council, while the constitutionally required quorum of sixty members was met, less than ten percent of the total tribal membership was present.
The Grievance Committee Procedure Act, Title 15 of the Sac and Fox Code, was adopted by resolution of the Business Committee (SF-82-17) on January 22, 1982. At the time of all proceedings mentioned above, it had not been considered by the Governing Council. The Constitution of the Sac and Fox Nation subsequently ratified in 1990 contains a requirement in Article IV that the Grievance Committee procedures must be approved by the Governing Council. The Court takes judicial notice that the Governing Council approved the Grievance Committee Procedure Act (Title 15 of the Sac and Fox Code) on May 31, 1997, without amendment, and after the events complained of in this case.
I. JURISDICTION OF THE COURT AND THE NATURE OF THIS PROCEEDING
The Tribal Courts are specifically authorized to review the actions of the Governing Council, the Business Committee, or any other tribal officers, agents or entities to determine whether those actions are prohibited by Federal or tribal law or the constitution. The courts are further authorized to declare any legislative or executive action unconstitutional and void, and to enter injunctive relief against unlawful actions by any executive officer or body of the Sac and Fox Nation. Sac and Fox Const. Art. V, § 7.
The Constitution of the Sac and Fox Nation which was in effect during all relevant times to this litigation was amended October 2, 1995, from a document that was newly ratified in 1990. This version of the Constitution is still the operative document today. It is substantially similar to the 1937 Constitution, in that it makes provisions for a Governing Council, a Business Committee, and a Grievance Committee.[1] Consequently, there can be no doubt that the Governing Council, Business Committee, and the Grievance Committee each constitute a body of the Sac and Fox Nation, with actions subject to review under the constitutional power of the tribal courts.
The instant action was received as an Application for Original Jurisdiction, or in the alternative, an appeal from the District Court. Because the District Court held that it did not have jurisdiction to review the actions of the Grievance Committee and the Governing Council, we accepted original jurisdiction. However, we find that the District Court did, indeed, have jurisdiction under the Constitution and laws of the Sac and Fox Nation to review the actions of the Grievance Committee and the Governing Council. Consequently, our acceptance of original jurisdiction may have been improvidently granted. Under our Constitution, the Supreme Court has original jurisdiction only *543 ft in such cases as may be provided by law, S and appellate jurisdiction in all other cases. Sac and Fox Const. Art. V, § 2. ! We note with interest that Title 15 of the ■i Sac and Fox Code, Grievance Committee ; Procedure, has now been approved by the - Governing Council, and is in full force and ⅞ effect. Any future officer removals and ft. judicial review thereof would be governed ft;.: by Title 15, and specifically the provisions of Chapter Six, Judicial Review. We ■ /. would suggest that the phrase, “Tribal ft" Court,” in that chapter would be interpret-■⅞-ed to mean the District Court, and that we ft would retain the power of appellate review ft; over the decisions of the District Court, ft;and not original jurisdiction.
We retain jurisdiction to settle this con-ft-troversy. Any future judicial review of ■/ officer removals, however, would be gov-3 erned by Title 15.
Complainant/appellant Young also raises the issue of the jurisdiction of the Honorable Phil Lujan, District Judge, to have heard the instant case on the trial level, She cites the recently enacted section 102(h) to Title 9 of the Sac and Fox Code, which reads,
District Judges who have not been accepted into the practice of law in a State or Federal Court as a practicing attorney shall be limited to presiding in cases involving Small Claims Procedure and Domestic Relations procedure not involving child custody.
She further submits that Judge Lujan Was at one time admitted to the Bar of the State of New Mexico, but at this time is neither a current member of the Bar of either New Mexico or Oklahoma. These factual allegations have been uneontroverted by the other parties to this case. As Ms. Young was serving as principal chief bn the date of enactment of this new statute on March 14, 1996, we appreciate her concern over Judge Lujan’s qualifications, and we must now address this subject.
While we would not be so cynical as to presume that this statutory section was enacted as a specific attempt to restrict the jurisdiction of Judge Lujan or to punish him for unpopular rulings against the tribe, we are convinced that the Business Committee merely sought to insure a certain standard of professional training and expertise with respect to judges handling the complex and difficult issues surrounding child custody and a general civil and criminal docket. Based on the facts as submitted by Ms. Young, we note that Judge Lujan was at one time accepted as a member of the Bar of the State of New Mexico. We hold that this membership fulfills the requirement of the statute that he havé been “accepted into the practice of law in a State or Federal Court.” We see no requirement on the face of the statute that current bar membership be a factor to judicial eligibility. Accordingly, we find that Judge Lujan was and is fully qualified to hear all matters in the District Court which may come before him, including this case.
II. DEVELOPMENT OF GOVERNMENTAL STRUCTURE AND POWERS
At the time of the first European emigrations to the New World, the Sauk and the Fox tribes were independent, sovereign entities, exercising their own forms of tribal government. Each clan had its own leader. The chief of the tribe came from a leadership clan, and was in office by virtue of bloodline. Governmental decisions were accomplished through general consensus of the tribe. Treaties were entered into with the governments of France and of Great Britain, and later, with the fledgling United States. After the Louisiana Purchase of 1804 and the conclusion of the War of *544 1812, French and British influences left the United States, and the United States began to exert more coercive influences over the tribes. The Sauk and the Fox tribes, having now become united as one body politic, entered into a treaty with the United States in 1868, which established the present location of the Sac and Fox Reservation in what is now the State of Oklahoma.
In 1885, the Sac and Fox Nation adopted a three department or branch constitutional form of government, with an executive branch, composed of the principal chief and other executive officers, a legislative branch, being a National Council composed of five elected members from each band, and a judicial branch, composed of Supreme and Circuit Courts. This form of government was, no doubt, patterned after the Constitution of the United States.
The political climate in Washington, though, began again to change, and, with the passage of the Oklahoma Organic Act, 26 Stat. 81, the General Allotment (“Dawes”) Act, 25 U.S.C.A. §§ 331 et seq,, the Curtis Act, 30 Stat. 495, and the Oklahoma Enabling Act, 34 Stat. 267, the mistaken notion that all tribal governments in Oklahoma were abolished succeeded in eroding the Sac and Fox government.
Finally, with the passage of the Indian Reorganization (“Wheeler-Howard”) Act of 1934 (“IRA”), 48 Stat. 984, 25 U.S.C.A. 461 et seq., and the subsequent Thomas-Rogers Oklahoma Indian Welfare Act of 1936, 49 Stat.1967, 25 U.S.C.A. §§ 501 et seq., the Sac and Fox Nation reestablished its tribal government and adopted the 1937 constitution. Significantly, though, under the IRA, Congress gave the Secretary of the Interior the power to approve all new tribal constitutions, a power which the Secretary has chosen to interpret as being a continuing power, and the Secretary used his considerable influence to have constitutions drafted in a common form. Housing Authority of the Sac and Fox Nation v. Kauley, Case Number SC-94-09. It is from this era that we received our present governmental form of General Council, Business Committee, and the new concept of the Grievance Committee.[2]
This historical background allows us to evaluate the role of the Grievance Committee in tribal government. There are no parallels in federal government, any of the state governments, or a common or civil law. The best analogy is that the Grievance Committee acts similarly to the U.S. House of Representatives in determining and passing a bill of impeachment, and the Governing Council acts similarly to the U.S. Senate in sitting as an impeachment court. Nevertheless, this is a matter of first impression with this Court. We hold that the Grievance Committee is a separate and independent branch of the Sac and Fox government, and that it serves a function which is primarily quasi-judicial in manner.
III. ISSUES OF FUNDAMENTAL FAIRNESS AND DUE PROCESS
In addition to the due process requirements of the federal Indian Civil Rights Act of 1978, supra., the Sac and Fox Bill of Rights also provides that the Nation shall *545 not deny to any person the equal protection of its laws or deprive any person of liberty or property without due process of law. Sac and Fox Const. Art. X, § 8.
The respondents/appellees submit that : the elected offices of the Sac and Fox Nation are not property interests entitled to due process protection. Brief of Tribal Defendants filed January 20, 1998, at 11. In Schexnider v. Grievance Committee of the Sac and Fox Nation, Case Number 74-1065-B-Civil (U.S.D.C.W.D.Okla), plaintiff Dora Schexnider, now Young, sued a grievance committee that included at that time Oma Patrick, also a party to the instant litigation. Judge Luther Boha-non admonished the parties:
Now we must understand and know and agree that the chieftainship of the Sac and Fox Indian Tribe is a valuable right. It is not only a valuable right in that there is some renumeration, direct or indirect, but it is the honor of being the chief of one of the finest and longest and oldest of the tribes of this country. This is a valuable right, just like the right to practice law is a valuable right.
[[Image here]]
The Court now finds that the plaintiff here has possessed, as Chief of the Tribe, a very valuable right. It is vested in the plaintiff by the vote of the Tribe, so it is hers for a period of two years. We concur with Judge Bohanon and find that an elected official of the tribe holds a valuable right. For that right—that office—to be stripped from an official, the official must be afforded equal protection and due process.
We now consider whether or not the eomplainants/appellants were afforded that due process. We do not agree with Ms. Young’s contentions that Ms. Patrick should be disqualified from acting and serving on the Grievance Committee by virtue of Ms. Patrick having been a defendant in Schexnider. That was a different case some twenty years ago involving different allegations, and has no bearing on Ms. Patrick’s fitness to serve on the present Grievance Committee.
 We are more concerned, however, with Ms. Patrick’s interest in the outcome of the complaints in the instant case by way of her being a signatory to the first petition against both Ms. Young and Ms. McCormick. Whether or not disqualifying interests exist is a factual question governed by the circumstances of each case. Montgomery County Board of Appeals v. Walker, 228 Md. 574, 180 A.2d 865 (1962). We must also consider whether a situation exists which tends to weaken public confidence and security in the protection of individual rights. Josephson v. Planning Board of Stamford, 151 Conn. 489, 199 A.2d 690 (1964).
As we have previously stated, the Grievance Committee operates in a quasi-judicial fashion to determine “probable cause” on alleged officer misconduct, and to decide whether or not to refer the matter to the Governing Council for a vote on removal.[3] Without the determination of the Grievance Committee that probable cause exists, the Governing Council cannot remove an officer, even on its own motion. Thus, the Grievance Committee’s function as gatekeeper is an extremely important one that helps to insure stability in tribal government and to minimize the impact of political infighting in the tribe.
*546 In order for a tribal officer to be afforded fundamental fairness and due process at the Grievance Committee level, it is imperative that the Grievance Committee members, as judges and jury, be completely disinterested and unbiased as to the complaints at issue. Further, the Grievance Committee must act so as to avoid even the appearance of impropriety.
In this case, we find that respondent/appellee Oma Patrick was originally a complaining petitioner in the first petition. Even though she did not specifically sign petitions two and three, petition one was incorporated by reference, and petition three was the complaint acted upon by the Grievance Committee. By refusing to re-cuse herself from the Grievance Committee hearing and ruling, she put herself in the role of complaining witness, judge, and jury. We are always very cautious when it comes to reviewing a completed act of the Governing Council. The Governing Council is the supreme governing body of the Nation. Sac and Fox Const. Art. II, § 1. Nevertheless, there are some principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. Snyder v. Massachusetts, 291 U.S. 97,105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). This is one of those instances.
Because of Oma Patrick’s participation in the Grievance Committee hearing and decision to refer the matter to the Governing Council, even though she had been one of the original complaining petitioners, we find that the complainants/appellants were fundamentally denied due process under the Constitution of the Sac and Fox Nation, and we hold that the Grievance Committee’s actions were thereby unconstitutional and are void. The removal vote of the Governing Council, therefore, must be vacated.
IV. PROCEDURAL ISSUES WITH RESPECT TO OFFICER REMOVAL
Because the actions of the Grievance Committee with Oma Patrick’s participation were unconstitutional and void ab initio, it is not necessary for us to reach and address the several complaints regarding notice, probable cause, and the definition of misconduct in office. We do note, however, that the petitions herein were unclear and confusing as to their allegations, and really did not even give the petition signers notice of the charges alleged. In the future, we believe that the better practice would be to include only one officer per petition or allegation, and to specifically state the complaints, rather than refer to another instrument.
We also note that the notices to the members of the Governing Council were tenuous at best. The tribe must be given adequate notice of both the charges and the meeting date, and, it would be better practice for new notices to be issued in the event of meeting postponements or adjournments. We would also urge the Grievance Committee to exercise its discretionary power with respect to meeting notices to find a more thorough way of notifying the tribal membership of the upcoming trial and vote than that provided in the statute.
Our efforts to consider all aspects of this case were frustrated by the tribal respondents/appellees’ refusal to abide by this Court’s order to provide transcripts of the Governing Council meetings. In the future, election and removal controversies before this Court will result in judgment being entered for the opposing party if tribal entity meeting transcripts are withheld in defiance of court order. Recording and transcription of Grievance Committee and Governing Council meetings are the responsibility of the Grievance Committee, *547 and not the court clerk. We further reserve judgment as to whether or not the parties’ rights of due process were violated at the Governing Council meetings.
V. CONCLUSIONS
We take judicial notice of the fact that because of the trial court’s erroneous de-termination that the removal of Dora Young and Mary McCormick from office was valid and constitutional, the Business Committee caused a special election to be held to fill the balance of the unexpired terms. In view of our finding that the removal process was unconstitutional and void, we hereby vacate the results of that special election.
Nothing in this opinion shall be construed as barring future charges and complaints being brought against the complainants/appellants on the same or different charges. However, any such proceedings must be handled within the scope of this opinion, the Constitution, : and the recently approved Title 15 to the Sac and Fox Code.
We are aware that there are several motions pending before the court. All such motions are hereby denied.
The Court Clerk is hereby directed to § enter judgment on behalf of the complainants/appellants. Dora S. Young is hereby i reinstated as principal chief of the Sac and f Fox Nation. Mary McCormick is hereby ¶ reinstated as secretary of the Sac and Fox Nation.
1C Nation. ORIGINAL JURISDICTION ASSUMED.
DECISION OF THE DISTRICT COURT VACATED.
JUDGMENT FOR THE COMPLAINANTS.
BLACK, C.J., and STEPSON, WAKOLE, and WATKINS, J J., concurring.

. The judicial branch of the government, present in the 1885 Constitution, but not the 1937 version, was not reestablished until the 1990 version of the Constitution.

. Only since Congress passed the Indian Self-Determination and Education Act of 1975, 25 U.S.C.A. §§ 450 et. seq., and the Indian Civil Rights Act of 1978, 25 U.S.C.A. §§ 1301 et seq., did the Bureau of Indian Affairs encourage the Sac and Fox to reestablish its court system. In the early 1980s, the tribe authorized adoption of a Law and Order Code, formerly codified at Title 22 of the Sac and Fox Code, and, ultimately, in 1990, adopted the present Constitution which established the judicial branch as a constitutional branch of government.

. While we do not reach herein the definition of what constitutes sufficient probable cause for referral, we are inclined to suggest a standard of clear and convincing evidence. We also do not reach the definition of officer misconduct.